Number 249531. Mr. Renner, you may proceed. Thank you. I am Richard Renner, and I would really like to reserve three minutes of my time for rebuttal. It is my privilege to represent Lonnie Frericks, who served this country through active duty in the United States Navy in a career that specialized in Explosive Ordnance Disposal, or EOD. This is a community of about 5,000 service members throughout the armed services. After retiring honorably from active service in 2006, he returned to the Navy as a civilian employee in 2008 to work in the program office that oversaw funding of EOD programs. There, one of his product users, or customers as they called them, was Robert Kissel, who led the Defense Technical Response Group. He, among other programs, was responsible for developing our country's tools to use against improvised nuclear devices, or INDs, more commonly called dirty bombs. And Lonnie Frericks began to see that of the millions of dollars Congress was appropriating, it wasn't going to Robert Kissel. Other managers, including Keith Plumidor and Amanda Vestlage, were diverting this money to other programs, other salaries, other expenses, other programs they wanted to fund. And Lonnie Frericks, being in the program office, gave Robert Kissel visibility about what happened to what eventually became $28 million Congress appropriated so we would have tools to use against dirty bombs, and we got absolutely not a single tool out of it. Mr. Renner, this is in reference to what is described under the Whistleblower Act as Disclosure Number 1. Yes, that's correct. And I think we're dealing in the case with, as I count them, we have Disclosures 1, 2, 3, 5, and 6, and Activity 3. All right, that's a lot to digest, and we've only got a limited amount of time. So let me just ask you a question about the disclosures as a whole. Why aren't the disclosures involved in this case that occurred before 2017 too far removed from Mr. Frericks' removal to be contributing factors? I will show you. If you will turn to page, Volume 1 of the Joint Appendix, page 131, this is the reprimand that was issued to Lonnie Frericks on September of 2010. There's no dispute about its authenticity. Lonnie Frericks did receive this reprimand. And it was issued. It says, Head EID Branch. This was Keith Plumidor, who was the supervisor of Amanda Veslage, who eventually became his successor. And in paragraph 1A, it goes over how Lonnie Frericks is being reprimanded for what he said in an integrated product team meeting about internal controls. In paragraph B, they specifically call out Lonnie Frericks' allegation that the program office did not have requirements management process. Lonnie Frericks was raising concerns about the internal controls about the money. And if there's any doubt about what this reprimand was trying to do, turn to page 133, paragraph 4, and it says, you have a right to make such allegations through the chain of command and any other federal entities that have been established to hear such allegations. However, your right to make such allegations does not extend to your co-workers, our customers, our product users. That's Robert Kissel. They're telling him, do not talk outside of our chain of command, our authorized structures here, because we don't want those people to know what we're doing with their money. All right. Now, compare that to page 113, which is Amanda Veslage's final decision removing Lonnie Frericks from federal service. And we're looking at paragraph C, employee's past disciplinary record. This is an aggravating factor. You were issued two letters of reprimand. September 2010, we just looked at that. And June 2015, I think the record indisputably shows that that was fabricated, that that reprimand was actually never issued to Lonnie Frericks. Both of these letters describe your behavior as disruptive and unprofessional, verbally derogatory remarks. And she goes on to explain how this is an aggravating factor that she considered in deciding that termination of his employment was the correct remedy. So it should not be so difficult here to connect the dots. When the decision maker herself connected the dots officially in writing in the decision removing Lonnie Frericks. Let me just ask you in that regard, because my question had to do whether it was a remoteness question. Right. Right. And I think what I'm hearing you say is that it isn't remote because it was mentioned by her on page 113. That's correct. But is this a fact, is remoteness a factual question or is it a legal question? In other words, could it be too remote as a matter of law, irrespective of whether it was mentioned then? Well, temporal proximity is one way to show causation. But it's not the only way. And here we have an example of direct evidence where the decision maker says, you know, the things that happened 10 years ago, that's a part of my reasoning here. That's why you're being fired. And she says that repeatedly in her decision, that this is a 10-year problem with Lonnie Frericks and that's why he's being removed. It can also be established by the pattern. And this court in the Marks case, for which I submitted a 28-J letter, recognized that a pattern of antagonism that starts soon after the protected activity, which is the 2010 reprimand, can establish that causal link even if it is beyond the time that would normally be appropriate for temporal proximity to apply. There are other ways. And there's no set limit on the methods of showing a contributing factor. And remember, Congress set a very low standard for whistleblowers. They only have to show that the protected activity was a contributing factor. And here the board did find that his concerns about the toxic fumes in the anechoic chamber were a protected activity that did contribute. It's also in writing as a factor specification in his termination. So we have at least some protected activity that was a contributing factor. So the one sufficient and necessary issue for this court is whether or not the Navy's evidence meets the clear and convincing standard. And this is my main point, that Congress passed this bifurcated causation standard that's very favorable to whistleblowers because they wanted to encourage federal employees to speak up. The target audience here is other federal employees, making sure that they know that if they speak up, the legal system will have their back and make sure that they're not going to suffer because they took a stand for the public interest. And it is, it can be a difficult standard for employers to meet. On page 66 of my brief, I cited the 11th Circuit case of Stone and Weber, where the court acknowledged that this can be difficult for employers, and Congress obviously intended it to be difficult. Well, don't we have an issue here with who is making the final decisions on the appeal? And if they discover or if they conclude that it's one way, can we go in and say, no, it's the other way? You have to. That is what the administrative procedure says. To defer to findings that were made by the board? It is this court's responsibility to make sure that the record as a whole shows that the evidence is clear and convincing. That is, that it's strong evidence, consistent, that it's not based on subjective factors or hearsay or fabricated evidence. Well, what if the fact finder says, well, I just don't believe you? I believe this. Now, if the clear and convincing standard under the Whistleblower Protection Act came down to just the credibility determination, then the Whistleblower Protection Act would be meaningless, because supervisors can go in, say whatever they want, and if it's found to be credible, that would be the end of the whistleblower's career. The clear and convincing standard is used for certain fundamental important rights for which our laws or our courts have said, we need to be really sure about these decisions. Parental rights cannot be terminated without clear and convincing evidence. Attorneys cannot be disbarred without clear and convincing evidence. The water rights of the state of Colorado cannot interfere with the water rights of New Mexico without clear and convincing evidence. Aren't you complaining, step two, with the final step of the analysis, the clear and convincing evidence standard, as I understand it, relates to the inquiry of whether or not a protected activity already deemed to be a contributing factor would or would not have been the same decision in the absence of that disclosure of a protected activity. We certainly would apply the final step at step two. I think you had acknowledged with regard to whether or not a protected disclosure was a contributing factor. Really there, we're just looking at whether or not there's substantial evidence. Do you agree with that? Whether there was substantial evidence that the 2010 disclosures... I think it's fair to characterize both steps there as substantial evidence, but as the Federal Circuit said in the Miller v. Department of Justice case, it has to be substantial enough evidence to be clear and convincing. I would suggest this is a mixed question of law and fact that requires an examination to see whether or not this is evidence that meets that high standard that Congress set. For example, if you look at Vern Hall's testimony about Lonnie Ferricks punching the computer and getting in his face, you know, the very first email Vern Hall sent after that supposed incident was on appendix one, page 74, and it makes no mention of these events. He doesn't raise them until nine days later when his supervisor asked him to write it up. So even if his testimony is credible, that doesn't make it strong. Just as the warden's testimony in the Miller v. DOJ case, even if it's credible, did not make it strong, did not show a consistent pattern of... Mr. Renner, I think the question, though, has to do with this clear and convincing evidence applied to the contributing factor step as well as the final question, which is whether the employer would have taken the same action in the absence of the whistleblowing, which is the language from Carr itself. I'm looking at it right now. Isn't that where clear and convincing applies? Only to the Navy's affirmative defense that they would have made the same decision without the protected activity. That is where clear and convincing evidence applies. Okay. I see him at three minutes, and I'd like to reserve my time. Thank you, counsel. Good morning, may it please the court. The jurisdictional and venue concerns that we raised in our opening brief have been resolved by Mr. Frevick's representations in his reply brief. So you no longer question jurisdiction? Correct. Can you move your microphone up a little bit? Oh, sure. Good. Thank you. Is that better? Yeah, I wanted to get that out of the way. Before turning to the merits, the court should affirm, because substantial evidence supports the board's decision. The Navy removed Mr. Frevick's from his position in the Explosive Ordinance Department after a series of escalating incidents of unacceptable conduct. And one of those escalating events was the complaints in 2010 about the misuse of that $28 million, right? I don't think that's correct. Well, how do you square that? Now, counsel, Mr. Renner referred to page 113 of the final decision. What about 116, where the final decision says, quote, the repeated nature of the altercations with sponsors and other stakeholders, both in 2010 and more recently in 2019, has seriously negatively affected our organization's reputation with key sponsors and stakeholders. That is part of the explanation that was given to Mr. Frevick about why he was being terminated. How can that not be, under Murano, at least a factor that tends to affect in any way the outcome of the decision? Ms. Veslage, the deciding official in this case, addressed this during her testimony at the evidentiary hearing, and she repeatedly testified that she did not rely on those letters of reprimand to make her decision. Her decision was based solely on the incidents in 2019, the three incidents in 2019. She did mention in her deciding letter references, she did reference the 2010 and 2015 letters of reprimand, and she did so. She explained the reason why she did so. I'm not saying the earth is flat. Her letter explaining exactly why she made the final decision expressly says in two places, both in 113 and 116, that this began, as you pointed out, an escalating pattern of antagonism, and she specifically starts that period, the creation of that pattern, with regard to his complaints in 2010. And I think the reason why she did that is, as she explained in her testimony, is because the 2010 and 2015 letters of reprimand provided notice to Mr. Frevick about what constituted acceptable and unacceptable behavior, because he had been warned in 2010 that his disrespectful, overly confrontational, and generally counterproductive conduct was unacceptable. And so it went to the notice that he knew that this was unacceptable conduct. He'd been warned in the past, and yet he continued to engage in that conduct. Does that mean that if he knew, because of what happened in response to his 2010 complaints, even with regard to the creation of notice, doesn't that in itself show that it tended in any way to affect the decision? I mean, step two is a really lenient requirement. Well, I agree that it was, if it created notice, doesn't that, a fortiori, satisfy step two? I don't necessarily think it does. Did it tend to affect in any way the decision to remove him? I think that it provided some notice to Mr. Frevick about what constituted unacceptable and acceptable conduct. Ms. Vestlage was very clear that her decision was based off of his conduct in 2019, and that was the basis for her decision to remove him. She was particularly upset with the most recent incident about punching the computer monitor and yelling at his, in his supervisor's face, standing up and staying within six inches of his supervisor's face and moving forward as his supervisor was backing away in fear and continuing to yell. That's what upset her. That was the basis for her decision, and her testimony was very, very clear about that was the reason why she removed him. Well, he denied that also. Well, so you have two people, one says yay, one says nay. Well, as you make a decision, are we stuck with that? The administrative judge did assess credibility at the evidentiary hearing, and the administrative judge credited the testimony of the supervisor, Vern Hull, when he explained what happened during that incident. Mr. Frevick actually didn't deny that he punched the computer monitors and yelled at him. Nobody had a picture of it. Nobody said it was broken. Nobody did a thing about it at that point in time. Well, the question on appeal right now is whether there's substantial evidence to support the charge. Well, okay, how about, how about the fact that, that several employees said, we thought he looked like he might be a shooter. Now, is that, I mean, that, to me, is just reaching into the air and pulling something out of nothing. And that was one of the things they relied on. Well, the other thing they relied on was the fact that he got annoyed when the odor from the glue on the tiles in the room, he opened the door a little bit and somebody closed it. He opened it again and he got in trouble. Now, is that an action that shows he's not fit for work? Seems pretty common sense to, you know, when you've got noxious fumes to open the window or open the door. Sure. And let me just address those in order. Ms. Veselich, the deciding official here, testified that her decision was based off of three incidents in 2019. The first was the altercation involving the 3D printer where Mr. Fredericks yelled aggressively at a coworker. Again, on that issue, they just decided we're not going to believe this man, we're going to believe this other person. And that's what I'm going to rely on. And nothing happened. I mean, he said, Juan, why didn't you tell me? And then Juan says, well, it got much worse than that, which was denied, and nobody did anything to him at that time. Next step, next item, are the tiles and the noxious fumes. And I just failed to see where that constitutes anything at all, whether you believe it or not. And the third thing that we came up with was on these, well, he gave the impression that he could be an active shooter. I mean, come on. Let me just address the active shooter incidents right now. So the ALJ can just, just because he's working for the Navy, can just say, well, I don't believe anything he says. Well, the ALJ is responsible for assessing credibility and found his testimony to be exaggerated, to change, to be affected. She found that the deciding official and Mr. Hull testified in a calm, measured tone that didn't show any bias. Yeah, but then she goes back to 2010 just to show that this has been a contributing factor. I mean, it just doesn't look right. Well, on the active shooter's point, I don't think the deciding official did rely on that. I think she was very clear that she relied on the incident involving the 3D printer, the noxious fumes, and most importantly, the punching the computer monitor and yelling in the supervisor's face. On the noxious fumes issue, the administrative judge found that that was a protected disclosure and it was a contributing factor. But the problem was the way in which Mr. Frerichs communicated his concerns about the noxious fumes. A yelling, aggressive manner, repeatedly coming into the workshop area where the work was being done, instead of addressing his supervisor, and to the point where the person who he was yelling at didn't feel comfortable working with him anymore. So it's the manner in which he was communicating his concerns. Counsel, can I just get some help from... Can I ask you... Do you mind if I interrupt? Go ahead. I just wanted to get an answer, because I didn't hear it, the part of Judge Kelly's question about the 3D printer. As I understand it, I just didn't hear you answer that. I think I heard you acknowledge that, at least to my ears, at step two, that Ms. Veselich did acknowledge that the disclosure about the 3D printer was a contributing factor. She said, I think you were saying in her testimony, that that's one of the reasons. Why isn't that, the 3D printer, a protected disclosure? As I understand it, the... Yeah. So I just wanted to hear you answer Judge Kelly's question. Oh, sure. I'm sorry. I'd be happy to answer that. It was not a protected disclosure for a couple of reasons. First, the administrative judge found that there was no rule that Mr. Freireichs reasonably could have reasonably believed he was disclosing a violation of. Are you sure? At page 134, I think what, and you may be correct, but I think what the ALJ says is that there was not a rule. There was not a local rule that required his approval for Mr. Sanchez to use the 3D printer. That is not necessary, as I understand it, for a protected disclosure. Even if there wasn't a rule, did he reasonably believe that there was a rule that would have required his approval before Sanchez could use the 3D printer? And I didn't see anywhere where the ALJ considers, addresses, makes a determination about whether or not he had a reasonable belief that there was a local rule that required his approval. Excuse me one second. It's okay. Okay. Just one second, please. It's not a test, so I don't want to interrupt with my colleagues. Okay. I think on page 272 of the final decision, there is a reference that there was no written or otherwise clearly established and implicated rule about the 3D printer at this time. Right. I get that. To the extent Mr. Fredericks is suggesting that there was a rule that he should have been informed about the printer breaking, there's no reasonable way that he could have believed that he was disclosing a violation of that, because he knew that the printer was broken.  And you're probably right. But the ALJ didn't find that. That's just you saying that. Right? Well, I think it's clear from the disclosure itself, and I think that's right. Wasn't there evidence that Mr. Roman Sanchez had already reported the malfunction before there was an altercation?  Mr. Roman Sanchez didn't hide it. He reported it to another one of the engineers in the printing room that there was a malfunction, and that engineer passed that information along to Mr. Fredericks. The disclosure itself, when were you going to tell me you broke the printer, I don't see how that could be reasonably construed to be a disclosure that Mr. Roman Sanchez was not permitted to use the printer. And to be clear, my only question was not whether or not there was a disclosure in the first place. My question was about the reasonableness of a belief that there had been a violation of this local rule, even if he was wrong. That was all I was trying to answer. But you answered it. I'll just try to add to that. On page 191, the administrative judge did find that as a result of this incident, Mr. Brown, the supervisor of Mr. Fredericks at the time, implemented a policy regarding the use of the 3D printers, and specifically instructions were placed on each 3D printer advising that if a printer malfunctioned, the user was to stop printing and immediately notify Mr. Fredericks. Mr. Brown did not mandate that other employees could not use a 3D printer or had to consult with the appellant before doing so. I understand all your arguments. I just don't have any idea how that relates to my question, to be honest with you. Yeah, there was an after-the-fact rule, whether or not that was an amendment of the rule or a clarification of the rule, whether he had made a disclosure by virtue implicitly through a question. And these are all great arguments. Again, I'm just trying to ask whether or not there was a finding that his belief that there had been a violation of the rule had ever been decided by the ALJ. But I think you've answered my question. I appreciate it. Thank you. Judge Matheson had a question. Well, just very quickly, I'm interested in your giving us some help on we're reviewing an agency decision and the standards of review on each of these three steps, whether something's a disclosure, if it was, was it a contributing factor? If it was, did it affect the ultimate decision? Are we reviewing each one of those? Let's just take them one at a time. Are we reviewing them de novo as a matter of legal determination, or are we reviewing them for substantial evidence and giving deference to the agency as to each one of those steps?  I think for all of them, you're reviewing them for substantial evidence. These are largely factual questions. I'll take them in order. In the protected disclosures, there's an issue about whether somebody reasonably believed that the disclosure they were making evidenced a violation of a rule. The reasonableness of a belief is largely a factual determination, and whether that's supported by substantial evidence is the appropriate standard of review on appeal. As to the contributing factor part of the analysis, that is also largely a factual question about whether something had any tendency to affect in any way the removal decision, and that largely turns on the findings of facts about the credibility assessments, the timing of disclosures, whether somebody would have reasonably believed that that disclosure did have an effect. And then as to the clear and convincing standard, that's almost purely an issue about whether there's sufficient facts to support the board's decision. Thank you, counsel. Thank you for your answer. As to the issue of whether Amanda Veslage can basically change her tune in live testimony and have that erase what she wrote in her written decision beforehand, I should explain that I was retained shortly before the hearing in this matter, before the administrative judge, and I submitted a brief in a pre-hearing submission that explained how I connected the dots between that 2010 reprimand being direct evidence that the protected activity was a contributing factor in the decision. And I think that may have had a role in why Amanda Veslage's testimony at the hearing was different than what it was in the written decision itself. But as to how to weigh that, in my brief I cited the U.S. versus U.S. Gibson decision. It's an old decision from the Supreme Court in which they said it's clearly erroneous to give weight to live testimony of a witness that's contradicted by the documents. And I think that applies here in this situation. Let me ask you this. If we agree with you on the 2010 as a contributing factor, that was not considered a contributing factor in the Carr analysis once the agency reached step three, correct? The American Citizens Protection Board and the administrative judge did not consider it because they held it was not a contributing factor. So they didn't get to the claimant convincing standard. Okay. But if we agree with you, what do we do next? Well, I don't think you can say that it's clear and convincing that Lonnie Ferris would have been fired if the stated reason is a protected activity. That was the situation in the Chambers case with the Department of Interior where they cited her complaints about... Okay. But what I'm asking you is this. If we agree with you on the contributing factor and the board didn't do that factor, didn't address that factor in its last step, the Carr analysis, what should this court do at that point? Do we remand to the agency? What happens next? If we go with your... Our request here is that the court find that with that direct evidence of causation, the Navy's evidence cannot be clear and convincing. And we're asking for reversal to the Merit Systems Protection Board for what we call corrective action. That's what the statute requires of the board when the agency's evidence is not clear and convincing. Then the whistleblower's entitled to corrective action and we would like the Merit Systems Protection Board to decide what that corrective action would be. And of course, we'd be looking for interim relief of reinstatement and back pay, the usual remedies that the law provides. Thank you very much. Thank you, Counselor. Thank you for your arguments. The case will be submitted and Counselor excused. Thank you.